UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,

                                   No. 09-CR-20482

-vs-

                                   HON. ARTHUR J. TARNOW

D-1   EDWARD P. MAY,

                Defendant.

_____/

**GOVERNMENT'S COMBINED RESPONSE AND BRIEF TO DEFENDANT'S
MOTION TO DISMISS INDICTMENT OR TO SUPPRESS EVIDENCE**

      The United States of America, by its undersigned attorneys, respectfully submits

this response to Defendant's Motion to Dismiss Indictment for Violation of Due Process

or, in the alternative, to Suppress Evidence Obtained from Private Counsel Assisting the

Government.

### I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

      In 1997, Defendant EDWARD P. MAY formed E-M Management Co. LLC, which

was located in rented office space in Lake Orion, Michigan.  After forming E-M

Management, MAY formed over 150 LLCs and told hundreds of individuals in the

Detroit metropolitan area, and elsewhere across the country, that the LLCs acquired

telecommunications equipment and then provided telecommunications services to

various hotels in Nevada, New York, New Jersey, California, elsewhere in the United

States, and in foreign countries.  MAY induced numerous persons to invest large amounts of money in the LLCs, purportedly for investment in "contracts" or "agreements" providing telecommunications equipment and services to various hotels. Such contracts and agreements, in fact, did not exist.

MAY caused fraudulent "private offering memorandums," "subscription agreements," and "investment recaps" for the LLCs to be drafted and distributed to potential investors. The offering memorandums fraudulently stated that E-M Management Co. had entered into agreements with various hotel corporations, including Hilton Hotels, Sheraton Hotels, Hyatt Hotels, and MGM Grand Hotels, to "provide all of the telecommunication services to the hotel properties" and to "install new equipment where needed, to purchase existing equipment where practicable and to cut over the services from present providers," and fraudulently promised investors that the funds raised "will be used solely for the purpose of purchasing telephone, high speed internet, low speed internet, [and] DVD equipment."  The offering memorandums "guaranteed a minimum monthly income" to each investment LLC.

The guaranteed monthly income promised by MAY to each investment LLC ranged from over $30,000 per month to over $100,000 per month.  MAY deceived victim investors into believing that their funds were being used and invested as represented and concealed from victim investors and others the fact that these "investments" were actually being used to support a pyramid or "Ponzi" scheme, by paying purported investment returns to some investors with funds actually obtained from other investors.

During the scheme, MAY utilized the services of a stock broker and investment advisor to solicit investments in the LLCs.  MAY also utilized the services of an accounting firm to legitimize the investments.

MAY diverted and misappropriated the funds invested in the LLCs to his own personal use and benefit and to the benefit of his company, E-M Management.  Among other things, MAY used the money invested by individuals in the LLCs to make payments to earlier investors which MAY falsely represented to the investors as a return of principal and income generated by the investment LLCs; to pay finder's fees, or referral fees, to several individuals who brought in new investors; to pay fees to several individuals who provided administrative assistance to MAY such as preparing and sending monthly checks and distribution reports to investors; to pay professional fees for tax preparation services for all of the investment LLCs, for MAY personally, and for MAY's other businesses; to pay for travel to and from Las Vegas; to gamble and pay personal gambling debts; to pay off personal bank loans; to personally invest in oil and gas leases and REITs; to personally invest in a number of businesses in Nevada and Michigan; and to pay his ordinary living expenses.

Over the course of the scheme, MAY induced individuals to invest over $200,000,000 in over 150 LLCs.  MAY's scheme resulted in a total loss of over $35,000,000 to the individuals who invested in the fraudulent LLCs.

In September 2007, MAY began to cooperate with federal authorities and, at the same time, sought to minimize the civil consequences of his massive Ponzi scheme.

Foreseeing the thousands of individual lawsuits that would inevitably be filed against him to recoup losses from investments in his Ponzi scheme, MAY sought the assistance of David Findling, a lawyer specializing in receiverships.  David Findling, EDWARD MAY, and MAY's attorneys mutually agreed that the most proactive and efficacious approach to stem the tide of inevitable lawsuits and collection actions would be to file two civil state actions entitled "An Assignment for the Benefit of Creditors."  Attorney David Findling of the Findling Law Firm, with MAY's consent, was appointed the Assignee of both EDWARD MAY and E-M Management.  The purpose of the assignments, *inter alia*, were to identify and collect all of the assets of MAY and E-M Management and to distribute the assets to MAY's creditors, including and most importantly, the victims of the Ponzi scheme. Pursuant to the duties and responsibilities of the Assignee, and with MAY's consent, Attorney Findling collected and reviewed all of the voluminous books, documents, and records associated with the Ponzi scheme. Also with MAY's express consent, Attorney Findling shared the books, documents, and records with the FBI and with the U.S. Attorney's Office.[1]

Despite MAY's cooperation with Attorney Findling and federal authorities, MAY elected not to opt for a pre-indictment plea. Consequently, on October 1, 2009, an indictment was returned charging MAY with fifty-nine counts of mail fraud and a

---

[1] In addition to the two Assignments and the on-going criminal investigation, the Securities and Exchange Commission ("SEC") filed a lawsuit against MAY in November 2007, United States Securities & Exchange Commission vs. Edward P. May and E-M Management Co., LLC, No. 07-14954 (Judge Feikens).  On January 7, 2010, the Court entered a consent judgment in the SEC case in the amount of $37,000,000.

notice of criminal forfeiture based upon MAY's development and perpetration of the largest Ponzi scheme in this District to date.

On September 28, 2009, two days before the indictment was returned, the FBI was informed that Berton May, one of several attorneys representing EDWARD MAY, ceased his employment with the law firm of May and Sucher on August 7, 2009, and abandoned several boxes of documents relating to EDWARD MAY and E-M Management at his former office. The FBI was further informed that the boxes had remained there despite a visit by Berton May to the office between his last day of August 7, 2009 and September 28, 2009. Shortly thereafter, the FBI advised the Assignee, David Findling Esq., of the existence of the boxes at May and Sucher. As required by his duties and responsibilities as Assignee for EDWARD MAY and E-M Management, Attorney Findling began arranging for retrieval of the boxes in order to determine whether they contained any materials relating to the assets of EDWARD MAY and/or E-M Management. Prior to arranging for the retrieval of the documents, the principal legal assistant at the law office confirmed that the boxes were abandoned.

On or about September 28, 2009, Findling's law firm retrieved the boxes. The FBI did not inspect, review, retrieve or, in any way, have contact with the boxes of documents prior to October 1, 2009, when the indictment in this matter was returned. It was not until on or about December 7, 2009, that the boxes were delivered to Special Agent Dan Troccoli of the Federal Bureau of Investigation from Attorney David Findling's office.

5

After providing Defendant with an extraordinary volume of records, including the boxes of documents abandoned at Berton May's office, Defendant filed the instant Motion challenging solely the government's acquisition of the boxes of documents from the Assignee, David Findling, Esq.

Because Defendant's challenge to the government's acquisition of these documents is based upon both factually incorrect assertions and legally unmeritorious arguments, Defendant's motion must be denied.

## II. ARGUMENT

### A.   The Government's Acquisition of Edward May Documents in September 2009 did not Violate Due Process

The instant motion's principal goal is to prevent the revelation of a biography written about EDWARD MAY by author, Steve Lehto.  The biography was amongst the documents contained in the boxes of materials abandoned by Berton May in August 2009.  To accomplish his goal, Defendant contends that (1) private counsel inappropriately assisted in the government in an investigative capacity, in violation of Defendant's due process rights; and (2) the document was work-product and/or privileged material prepared by Steve Lehto, as attorney for EDWARD MAY.  Defendant requests that the indictment be dismissed, if the biography was presented to the grand jury, or, in the alternative, that the biography be suppressed and unavailable for use at trial.

In support of his due process argument, Defendant alleges that the government inappropriately delegated its investigative responsibilities to a private party who was

6

simultaneously representing the interests of the victims of the Defendant's fraud. As described below, the facts and legal basis upon which Defendant's argument rests are each inapposite.

To begin, the government did not take possession and/or review the biography and the accompanying documents until well after the grand jury investigation was complete and the case indicted.  The grand jury investigation was complete and the indictment returned on October 1, 2009.  The FBI did not take possession of the boxes of documents until December 7, 2009 (*see* Exhibit 1, Affidavit of Attorney David Findling) and did not review any of the documents contained therein until January, 2010.  (*See* Exhibit 2, FBI 302 dated January 5, 2010).  Thus, Defendant's request that the indictment be dismissed, based upon the submission of the biography to the grand jury, must be denied on the facts alone.

Defendant's alternative argument that the biography should be suppressed is based upon his theory that the Assignee, David Findling, was acting as an agent or instrument of the government when he took possession of the biography and accompanying documents.  Contrary to all of the assertions in Defendant's brief, David Findling neither acted as an agent of the government nor acted in conflict with his obligations to the creditors of EDWARD MAY and E-M Management.

The Fourth Amendment, "proscribes only governmental action and does not apply to a search or seizure, even an unreasonable one, conducted by a private individual not acting as an agent of the government." *United States v. Bruce*, 396 F.3d

697, 705 (6th Cir. 2005)(quoting *United States v. Lambert*, 771 F.2d 83, 89 (6th Cir.

1985)), *vacated and remanded on other grounds (Booker* remand), 405 F.3d 1034 (6th

Cir. 2005).  "A person will not be acting as a police agent merely because there was

some antecedent contact between that person and the police." *Lambert*, 771 F.2d at 89.

Rather, two elements must be shown in order to treat ostensibly private action as a

state-sponsored search: (1) the police must have instigated, encouraged, or participated

in the search; and (2) the private individual must have engaged in the search with the

intent of assisting the police. *Lambert*, 771 F.2d at 89.  Regarding this latter element of

intent, the Court of Appeals for the Sixth Circuit has explained that a private party is not

an agent of the government where "the intent of the private party conducting the search

is entirely independent of the government's intent to collect evidence for use in a

criminal prosecution." *United States v. Howard*, 752 F.2d 220, 227 (6th Cir.), *vacated on*

*other grounds*, 770 F.2d 57 (6th Cir. 1985); *see also United States v. Foley*, No. 93-

1838, 994 WL 144445 at *2 (6th Cir. Apr. 21, 1994)("[I]f the intent of the private party

conducting the search is independent of the official desire to collect evidence in a

criminal proceeding, then the private party is not acting as a state agent.").

As represented by the Affidavit of David Findling, Esq. (*see* Exhibit 1), private

counsel did not assist the United States Attorney's Office by performing government

investigative and prosecution functions.  Defendant MAY consented to the appointment

of Findling as Assignee after lengthy discussions and confessions of MAY's criminal role

in developing and executing the Ponzi scheme.  (*See* Defendant's Exhibit C, Addendum

to Assignment for the Benefit of Creditors; Defendant's Exhibit J, Memo to May

File/Notes from Meeting with Edward May).  Once Findling was appointed Assignee by

Oakland County Circuit Court, with Defendant's consent, Attorney Findling was

obligated to fulfill his duties and responsibilities as Assignee by acquiring, retrieving,

compiling, and reviewing all documents relating to or potentially relating to the assets of

EDWARD MAY and E-M Management.  Beginning at his appointment in October, 2007,

Attorney Findling was assigned the power and duty to, *inter alia*, "take possession of all

goods . . . documents, books, records, work papers . . . and other papers of Edward

Paul May . . ." and EDWARD MAY consented to the power of Findling to "take

immediate possession of and to copy: all books, records, notes, memoranda . . . diary

notes, notes, records, books . . .in whatever form belonging to Edward Paul May or any

business owned or operated by Edward Paul May." (Defendant's Exhibit C, Addendum

to Assignment for the Benefit of Creditors).

      As attested to by Attorney Findling, he carried out these duties due to his

obligations as Assignee and not because federal law enforcement or federal

prosecutors directed him to do so.  Findling definitively states that, "[D]uring my term as

Assignee, my decisions and actions have been made in accordance with my fiduciary

duties as Assignee and have never been directed or influenced by federal law

enforcement and/or the U.S. Attorneys office.  Each and every decision and action

taken by me has been independent of the criminal investigation and prosecution of

Edward May."  (Exhibit 1, paragraph 11).  Findling further attests that his "decision to

retrieve and review these boxes of documents was consistent with my fiduciary responsibilities, my verification that they had been abandoned, and my authority under state law (See MCL 600.5211(2)).  Further, it was wholly independent of the federal government's investigation of Edward May and not based upon any direction by federal law enforcement."  (Exhibit 1, paragraph 18).  Confirming that his retrieval of the boxes was independent of the government's investigation, Findling attests that "[b]ecause of my duties and responsibilities as Assignee, I would have retrieved and reviewed these boxes regardless of whether the federal government was involved in investigating and prosecuting Edward May." (Exhibit 1, paragraph 22).

On these facts, it is undisputable that Attorney Findling was acting in a private capacity and that his actions do not implicate the Fourth Amendment.  *See United States v. Jacobsen*, 466 U.S. 109, 113 (1984)(holding the Fourth Amendment inapplicable "to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official."); *see also Lambert*, 771 F.3d at 89 (private individual who brought drug evidence to the FBI on 25 separate occasions acting in private capacity; therefore, "the search must be deemed to be a private search and, therefore, not within the purview of the Fourth Amendment"). "Once a private search is conducted, the government's subsequent use of the information obtained in the private search does not implicate the Fourth Amendment as long as the government's use does not exceed the scope of the private search."  *United States v. King*, 55 F.3d 1193, 1196

(6th Cir. 1995).

Because Findling's initial review of the documents was a private search outside the bounds of the Fourth Amendment, and the FBI's review of the documents did not exceed the scope of the private search, there is no basis upon which to suppress the biography.  As in *Jacobsen*, MAY's "privacy interest in the contents of the [boxes] had been [already] largely compromised" by the initial discovery and "the agent's visual inspection of [the] contents [of the boxes] enabled the agent to learn nothing that had not previously been learned during the private search." *Jacobsen*, 466 U.S. at 111-12.

Defendant's attendant argument that the biography should be suppressed because the United States Attorney's Office used a private attorney representing victims of fraud to carry out investigative functions is similarly without merit.  In support of his argument, Defendant relies upon a Tennessee Court of Appeals case, *Tennessee v. Eldrige*, 951 S.W.2d 775 (Tenn. Court of Criminal Appeals, 1997), which is wholly inapposite.  In *Eldrige*, the defendant was prosecuted and convicted of attempted murder.  The district attorney, assigned to prosecute and try the case, completely relinquished control of the trial to private attorneys appointed as special prosecutors. The private attorneys, while acting as special prosecutors of the defendant, also represented the murder victim in a $3,000,000 civil suit against the same defendant. Overtly demonstrating their conflict of interest, the private attorneys, while appointed special prosecutors, communicated with criminal defense counsel regarding a substantial cash settlement of the civil case in conjunction with a plea agreement in the

11

criminal case.  *Eldridge*, 951 S.W.2d at 779, 786.  In light of the private attorneys' dual role as special prosecutors and as civil attorneys representing the victim in a pending monetary suit and the district attorney's complete relinquishment of control to the special prosecutors, the Tennessee Court held that Eldrige's due process rights were violated.  *Eldrige*, 951 S.W.2d at 782.

Defendant similarly relies on *Kerns v. Wolverton*, 381 S.E.2d 258 (S. Ct. App. Va. 1989), to support his claim that even pre-indictment participation by private counsel violates a defendant's due process rights.  In *Kerns*, however, an attorney paid by an embezzlement victim was appointed to assist in the prosecution of *Kerns* in the criminal embezzlement case involving the same victim.  The private attorney's assistance included appearing before the grand jury to question witnesses against the defendant. *Kerns*, 381 S.E.2d at 260.  The Virginia Court held that a private attorney may not, even when appointed to assist in a prosecution, appear before a grand jury and question witnesses. *Kerns*, 381 S.E. 2d at 262.  Accordingly, the indictment against Kerns was dismissed. *Kerns*, 381 S.E. 2d at 264.

 Defendant MAY cannot, in good faith, analogize the facts in *Eldrige* and *Kerns* to those in the instant case.  With regard to grand jury proceedings, Attorney Findling did not assist the government in any way during grand jury proceedings and certainly never appeared before the grand jury to question witnesses.  With regard to the specific items Defendant seeks to suppress, the government did not even take possession of the documents prior to the return of the indictment, so the grand jury did not consider the

materials in its evaluation of the case.  With regard to post-indictment proceedings,

Findling has not been and will not be appointed to assist the United States Attorney's

Office in the prosecution of this matter in any fashion.  While the government and

Attorney Findling will continue to communicate with each other on matters that are

permissible by law and ethics to be shared, and when it is in the best interest of all of

the parties, the prosecutors and the Assignee will remain independent of each other and

impartially dedicated to the pursuit of their respective cases.

Because Attorney Findling, as demonstrated by the facts of these proceedings

and by his Affidavit, has neither acted at the direction of the prosecution nor in conflict

with the creditors to whom he owes a fiduciary duty, Defendant's assertions to the

contrary must be rejected.[2]

---

[2]MAY's brief suggests that Defendant's Exhibit L demonstrates the U.S. Attorney's Office use of Attorney Findling as a government agent.  Contrary to Defendant's suggestion of sinister puppetry by federal law enforcement, Exhibit L, which summarizes a meeting between the undersigned AUSAs, the FBI, and Attorneys Findling and Shapiro, merely reflects the on-going cooperation between the civil and criminal attorneys.  Because Attorneys Findling and Shapiro, by the time of the June 2009 meeting, had significant interaction, contact, and knowledge of and about the victims of the Ponzi scheme by virtue of the civil questionnaires distributed by Findling and Shapiro, the government merely requested their input as to which victims the government ought to personally interview in a complicated case involving nearly 1,500 victims.

13

**B.**   **Exhibit M and Other Abandoned Documents Are Not Protected by the Attorney-Client or Work-Product Privilege**

Defendant lastly seeks to suppress the biography ostensibly on the theory that it constitutes attorney-client and/or work-product privileged material produced by Attorney Steve Lehto.  Despite Attorney Findling's significant role in the civil aspects of the Ponzi scheme, the federal government's role in investigating this criminal case, and numerous and continuing contact and discussions with attorneys for EDWARD MAY by both since 2007, neither have ever heard of Attorney Steve Lehto until the instant motion was filed.

While Steve Lehto is a licensed attorney, he is more widely known for his biographical writings about Michigan celebrities. On his biography page at Amazon.com, Lehto describes himself as follows,

> I am an attorney, author and professor. I practice and teach law in southeastern Michigan, and I also teach Michigan History at University of Detroit Mercy. My most recent book is "Michigan's Columbus: The Life of Douglass Houghton." My previous book was "Death's Door: the Truth Behind Michigan's Largest Mass Murder." That book won several awards, and was named a Michigan Notable Book by the Library of Michigan in 2007. I spend a lot of time speaking about these topics -- and others in Michigan history -- whenever I get the opportunity . . .

*See* http://www.amazon.com/Steve-Lehto/e/B001JPA7O4.  Steve Lehto's published books include, "*Michigan's Columbus: The Life of Douglass Houghton", "Death's Door: The Truth Behind Michigan's Largest Mass Murder*", "*The Lemon Law Bible: Everything the Smart Consumer Needs to Know About Automobile Law*", "*Bobby Isaac: What Speed Looks Like*", "*Chrysler's Turbine Car: The Rise and Fall of Detroit's Coolest Creation*", and *"Italian Hall:  The Official Transcript of the Coroner's Inquest.*"

14

Despite Defendant's assertions to the contrary, the biography contained within the documents delivered by EDWARD MAY to the storage room at May and Sucher (*see* Defendant's Exhibit M) was the first draft of a book intended to be written by Steve Lehto about EDWARD MAY's life.  Prior to placing the draft in storage, Steve Lehto met with EDWARD MAY and Berton May, in early 2009, at the law office, on three occasions, to discuss a biography Lehto intended to author about EDWARD MAY.  (*See* Exhibit 3, Affidavit of Legal Assistant Tina Pheney).  According to Tina Pheney, the principal legal assistant with the Sucher Law Firm (formerly the May and Sucher Law Firm) responsible for maintaining all case files within the office, preparation of pleadings and correspondence, client contacts, and maintaining the firm's letterhead and client list, Steve Lehto met with EDWARD MAY specifically to "do a book."  According to Ms. Pheney, had Steve Lehto represented EDWARD MAY in a legal capacity at or through the law office of May and Sucher, she would have known of and had access to the client file and client documents.  No such files and/or documents existed at the law firm. (*See* Exhibit 3).

Any contention that Defendant's Exhibit M is consistent with attorney notes is belied by even one cursory reading of the document.  Although the biography clearly would not have been written absent ED MAY's role in perpetrating the largest Ponzi scheme in Michigan's history, Defendant's Exhibit M is true to a biographical sketch of its subject:  in this case, EDWARD MAY.  It begins with MAY's birth, childhood trials and tribulations, and continues through his high school, college, and law school education.

15

At each stage, it includes the locations MAY lived and the length of residency in each location.  It describes, in great detail, his family members, including their jobs and hobbies, and recounts the profound affect his father's death had upon him.  It proceeds through MAY's graduation from law school and his first legal related employment. Lehto's writing then depicts MAY's relationship with the Detroit Tigers, Al Kaline, and Denny McLain, including his legal representation of and business ventures with Denny McLain and other professional baseball players.  His relationship with McLain and the Tigers, according to Lehto's work, culminated with MAY being charged with writing bad checks, a headline in the local papers of "Kaline's Attorney Charged," and his disbarment from the Michigan bar.  The writing continues with multiple pages of stories about MAY's gambling habit, his numerous trips to Las Vegas, and various investment and business ventures.  Eventually, Lehto recounts the commencement and execution of the Ponzi scheme.  Such a detailed expose by Lehto of MAY's life, from birth to present, was unquestionably intended to form the groundwork of a biography and was destined to be published.

Even if Defendant were able to establish that Steve Lehto represented him in some legal capacity, Defendant's Exhibit M is not protected from disclosure by either the attorney-client privilege or the work-product privilege.

The attorney-client privilege does not shield from discovery every communication by an individual to a lawyer; rather, the privilege is narrowly circumscribed by its purpose: the privilege is construed narrowly to protect from disclosure only those

communications from the client to the attorney which were intended to be confidential and made for the purpose of seeking legal advice. *United States v. Collis*, 128 F.3d 313, 320 (6th Cir. 1997); *In re Grand Jury Investigation* No. 82-3-35, 723 F.2d 447, 450 (6th Cir. 1983). The burden of establishing the existence of the privilege rests with the person asserting it. *In re Grand Jury Investigation No. 82-3-35, 723* F.2d 447, 450 (6th Cir. 1983).

In the instant case, Defendant attempts to blanket every communication by EDWARD MAY with anyone holding a law license with the privilege. Even a cursory review, however, of Defendant's Exhibit M clearly supports the government's position that the document was created by Steve Lehto for the purpose, as stated by Ms. Pheney, "to do a book." Documents created, even by a lawyer, for the purpose of writing a biography are not protected by the privilege as the communication was intended to be published rather than confidential.

Defendant's Exhibit M and the remaining documents in the boxes stored at the law office are similarly not protected by the work-product privilege. The work-product privilege, as first recognized by the Supreme Court in *Hickman v. Taylor*, 329 U.S. 495 (1947), was designed to permit an attorney to "assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference . . . to promote justice and to protect [his] client's interests." *Hickman*, 329 U.S. at 511. The current doctrine is articulated in and defined by Rule 26(b)(3) of the Federal Rules of Civil Procedure which

17

protects from disclosure "documents . . .otherwise discoverable . . . prepared in anticipation of litigation and for trial . . ." Fed. R. Civ. P. 26(b)(3).  As with the attorney-client privilege, the party asserting the work-product privilege bears the burden of establishing that the documents are protected. *United States v. Roxworthy*, 457 F.3d 590, 593 (6th Cir. 2006). If the document is prepared for some other non-litigation purpose, it is not protected by the privilege.  *Roxworthy*, 457 F.3d at 593.  Significantly, a document is not protected "if it would have been prepared in substantially the same manner irrespective of the anticipated litigation."  *Roxworthy*, 457 F.3d at 593-94.

Defendant MAY has not bore his burden of establishing that Defendant's Exhibit M or any of the other documents in the stored boxes were prepared in anticipation of litigation; he has not even articulated with particularity the nature of the relationship between he and Steve Lehto or identified the actions for which the documents were prepared.  The government, to the contrary, has demonstrated that Defendant's Exhibit M was intended to be used by Steve Lehto to write a biography of EDWARD MAY. (*See* Exhibit 3).  Pursuant to the Sixth Circuit's opinion in *Roxworthy*, even if Defendant were able to establish that the document was to be used for the dual purpose of litigation and commercial authorship, it is not protected by the privilege.  *See Roxworthy*, 457 F.3d at 593-94.

Furthermore, even if Defendant were able to establish that Defendant's Exhibit M was prepared by Steve Lehto in connection with a legal matter involving EDWARD MAY and protected by one of the privileges, Attorney Findling was authorized, as Assignee,

18

to obtain the document and utilize it as he saw fit.  *See Athridge v. Aetna Casualty and Surety Co.*, 184 F.R.D. 181 (D.D.C. 1998).   An assignor cannot assert the attorney-client privilege or the work-product privilege to protect documents from disclosure when a global assignment of claims from an event has transpired.  *Athridge*, 184 F.R.D. at 194 (assignee entitled to files maintained by attorneys who represented the assignor); *see also FDIC v. McAtee*, 124 F.R.D. 662, 664 (D. Kan. 1988)(the assignment of assets does not transfer the attorney-client privilege to the assignee); *In re Hunt*, 153 B.R. 445, 453 (Bkrtcy. N.D. Tex. 1992)("'the mere transfer of assets from one person to another does not entail the transfer of the individual's attorney-client privilege as well'").

In summary, MAY has not met his burden to establish that Defendant's Exhibit M and its accompanying documents were produced in confidence and for the course of seeking legal advice and, even if Defendant can establish that the document is protected by one of the privileges, David Findling, as Assignee, was entitled to obtain, review, and distribute the document.   Therefore, Defendant's assertions that the document must be suppressed pursuant to the attorney-client privilege or the work-product privilege must be rejected.

### III. CONCLUSION

For the aforementioned reasons, Defendant's Motion to Dismiss Indictment for Violation of Due Process or, in the alternative, to Suppress Evidence Obtained from

Private Counsel Assisting the Government must be denied.

Respectfully submitted,

BARBARA L. MCQUADE
*United States Attorney*


*s/Stephen L. Hiyama*
STEPHEN L. HIYAMA
*Assistant United States Attorney*
211 West Fort Street, Suite 2001
Detroit, Michigan  48226
phone:  313-226-9674
e-mail:   stephen.hiyama@usdoj.gov
bar no.:  P32236


*s/Sarah Resnick Cohen*
SARAH RESNICK COHEN
*Assistant United States Attorney*
211 West Fort Street, Suite 2001
Detroit, Michigan  48226
phone:  313-226-9637
e-mail:   sarah.cohen@usdoj.gov
bar no.:  P51968


Date:  May 3, 2010

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on May 3, 2010, I electronically filed the foregoing document

with the Clerk of the Court using the ECF system which will send notification of such

filing to the following:

**Mr. Harold Gurewitz, Esq.**

I further certify that I have mailed by United States Postal Service the document

to the following non-ECF participants:

**N/A**

<u>s/Sarah Resnick Cohen</u>
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226
Phone:  (313) 226-9637
E-Mail:  Sarah.Cohen@usdoj.gov
Bar Number: P51968